(Reap. Dec. 10242)

SAMUEL SHAPIRO & COMPANY, INC., A/C THE SHARPE & HART ASSOCIATES, INC. *v.* UNITED STATES

Entry No. 1100.

(Decided May 9, 1962)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff. *William H. Orrick, Jr.,* Assistant Attorney General (*Richard H. Welsh* and *Morris Braverman,* trial attorneys), for the defendant.

RICHARDSON, Judge: This appeal for reappraisement presents the question as to the proper dutiable value of certain rifle parts, which were exported from Otterup, Denmark, on July 21, 1956, and entered at the port of Baltimore, Md., on August 6, 1956. The merchandise was packed in 10 cases and was described on the commercial invoice as "100 actions cal. 222 Rem. M.54" (an action is the firing mechanism of a rifle). The actions were entered at $37 each, United States money, and were appraised by the appraiser on the basis of United States value at $67.057, each, United States money, net, packed.

At the trial, the issues were submitted to the court upon the official papers, a stipulation of facts, testimonial and documentary evidence, and reports of customs agents. Among other things, it has been stipulated and conceded that, at the time the involved merchandise was exported from Denmark, there was no foreign or export value

for such merchandise and no United States value for similar merchandise. The question which remains for the court to decide is whether there was, at such time, a United States value for such merchandise, and, if so, what that value was, and whether certain charges and expenses should be deducted therefrom over and above those allowed by the appraiser. In the event that the court is unable to find a United States value for such merchandise, it has been alternatively stipulated and conceded that cost of production would be the proper basis of valuation of such merchandise, and that, in such event, cost of production of the involved merchandise is $37 each, United States money, net, packed.

According to the uncontroverted evidence of record, it appears that prototype merchandise (M.54 actions) was first imported by plaintiff at the port of Baltimore, Md., on March 2, 1955, under entry No. 4663, under a 3-year agreement with the Danish manufacturer-seller, Schultz & Larsen of Otterup, Denmark, dated July 30, 1954, making The Sharpe & Hart Associates, Inc., the sole United States purchaser-distributor of certain Schultz & Larsen products. Up until October 1, 1955, the invoice price of the prototype merchandise which was purchased from Schultz & Larsen and entered by plaintiff was listed at $33.50 each. Subsequent to October 1, 1955, Schultz & Larsen increased this price to $35.20 each to meet increased production, shipping, and other costs.

The distributor, whose principal place of business is located at Emmitsburg, Md., does not sell at retail, but only to dealers and jobbers. Between August 1, 1955, and January 11, 1956, its wholesale list price for the prototype merchandise which it imported was $57.66. This price was increased to $59.50, effective January 11, 1956. All of the prototype merchandise which the distributor imported since January 1, 1956, was sold to the Ted Holmes Gun Shop of Mattoon, Ill., at the wholesale price of $59.50, under an agreement awarding the sole distributorship of such merchandise to the Ted Holmes Gun Shop. The terms of sale were 2 per centum discount, if paid within 10 days, net, 30, all f.o.b. Emmitsburg, Md.

The prototype M.54 actions were listed for sale by the Ted Holmes Gun Shop both at wholesale and at retail at list prices of $72.50 and $90 each, respectively. And with but one exception, the usual quantities in which the merchandise was sold consisted of single-action lots whether sold at wholesale or at retail. In the case of the single exception, two actions had been sold to a customer on one order. All sales were made at Mattoon, Ill., and were made without the imposition of any restrictions by the Ted Holmes Gun Shop.

At and about the time that the involved merchandise was exported from Denmark, to wit, July 21, 1956, the record discloses the following

transactions with respect to the sales of the prototype merchandise acquired as aforesaid by the Ted Holmes Gun Shop:

| Date | Merchandise | Address | Price | Wholesale or retail |
|------|-------------|---------|-------|---------------------|
| June | | | | |
| 8 | M54 | Tulsa, Okla. | $70. 00 | Wholesale |
| 19 | M54 | Indianapolis, Ind. | 90. 00 | Retail |
| 28 | M54 | Windsor, Ill. | 90. 00 | Retail |
| July | | | | |
| 11 | M54 | Terre Haute, Ill. | 90. 00 | Retail |
| 25 | M54 | Tulsa, Okla. | 72. 50 | Wholesale |

Appraisement of the involved merchandise was predicated upon the Mattoon, Ill., retail selling price for the prototype merchandise, which price is conceded by the parties to be the price at which the prototype merchandise was freely offered for sale to all purchasers for domestic consumption. In this connection, the stipulation reads in part:

4. At the said time of exportation said actions were freely offered for sale at $90.00 each in Mattoon, Illinois, by the Ted Holmes Gun Shop to all purchasers for domestic consumption, said actions having previously been purchased from Sharpe & Hart, Emmitsburg (where they had been originally delivered from Denmark) and shipped from Emmitsburg to Mattoon.

5. The appraised value of $67.057 each, net packed, was based upon a "United States value" for "purchased merchandise" as defined in Section 402(e) Tariff Act of 1930, computed as follows:

Sales price per piece in Mattoon _____ $90. 00
Less 2% discount for cash _____ 1. 80
_____
$88. 20
No profit to seller in Mattoon _____ 0
_____
$88. 20
Less general expenses to seller in Mattoon, which exceeded 8% _____ 7. 056
_____
$81. 144
Less cost of transportation and insurance from Denmark to Mattoon __ 2. 155
_____
$78. 989
Less U.S. duty _____ 11. 932
_____
Appraised value per piece, net packed _____ $67. 057

The foregoing constitutes the substance of the evidence pertinent to the issues before the court.

Considering the issues in the order in which their prominence appears in the record, I am of the opinion that the first question to be decided is whether the involved merchandise is dutiable on the basis of United States value or on the basis of cost of production. The determination of this question turns upon the ascertainment of the

place where, under the evidence, the principal market for the proto-type merchandise is located—Emmitsburg, Md., or Mattoon, Ill. If, as plaintiff contends, the principal market for this merchandise was located at Emmitsburg, Md., then cost of production would be the proper basis for valuation of the involved merchandise. On the other hand, if, as defendant contends, the principal market for the proto-type merchandise was located at Mattoon, Ill., then United States value would be proper basis for valuation of the involved merchandise. And this is due, of course, to the fact that, according to the evidence of record, sales were restricted in the Emmitsburg market and were not restricted in the Mattoon market.

In support of its contention, plaintiff argues that the words "principal market," as used in section 402 (e) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, is limited in its application only to the place where the merchandise is first transferred from exporter to importer and that, if the sales which characterize such transfer at such place be restricted, then United States value, as defined in section 402 (e), *supra*, cannot govern the valuation of the merchandise for duty purposes. The defendant maintains that the words "principal market," as used in this statute, are applicable to any place where the merchandise is transferred after importation, if the sales which characterize such transfers otherwise comply with the statute.

Section 402 (e), *supra*, reads as follows:

The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

As I read the statute, the words "in the principal market of the United States" bear no relationship to the numerical sequence in which the imported merchandise moves from one market in the United States to another on its way from exporter to ultimate purchaser. Nor do I find in the statute any congressional intent to circumscribe the meaning of the words "principal market," in the manner con-tended for by the plaintiff, and to limit their application to a primary United States market, as distinguished from a secondary or other United States market. Of course, the very words "principal market" themselves imply that there may be other markets in the United

States in which such imported merchandise is sold at any given time. But it appears that Congress intended by the use of the word "principal" before the word "market" to set one market apart from all the others in terms of the greater commodity sales volume in such market over all others rather than in terms of any chronological order in which the imported merchandise passes from one market to another.

In *Innes, Speiden & Co. et al.* v. *United States*, 19 C.C.P.A. (Customs) 1, T.D. 44789, the ascertainment of the "principal market" was viewed and considered by the appellate court from the standpoint of which one of several markets produced the greater sales volume of the imported commodity in accordance with statutory requirements. And the ascertainment of the principal market did not there turn on any chronological order of movement of the merchandise through the various markets considered. Although the basis of valuation, in that case, was the American selling price of a commodity similar to the imported article, nevertheless, the case is persuasive on the question here raised, in view of the fact that the terms "principal market" carry the same singular meaning in the determination of United States value as in the determination of American selling price. I, therefore, find that the words "principal market," as used in section 402(e), *supra*, embrace the sales made of the prototype merchandise at Mattoon, Ill., and not the sales made at Emmitsburg, Md. A "principal market" exists where a person or firm "freely offers" such or similar merchandise. *American Import Co.* v. *United States*, 7 Cust. Ct. 556, Reap. Dec. 5470. Affirmed, *United States* v. *American Import Co.*, 8 Cust. Ct. 737, Reap. Dec. 5642. Consequently, in view of the fact that it has been conceded that the sales made at Mattoon, Ill., otherwise met the requirements of the statute, I hold that United States value is the proper basis of valuation of the involved merchandise.

The other question in the case concerns itself with the propriety of the allowances made by the appraiser against the United States selling price of the involved merchandise. Plaintiff maintains that the allowances should have included clearance charges at Baltimore, Md., of $0.28 each, and the general expenses of The Sharpe & Hart Associates, Inc., in the amount of $0.32 each. There is a paucity of proof in the case pertaining to these items. In fact, nowhere in the record before me do I find any clarification of the nature of the clearance charges such as would enable me to determine whether such charges may be considered in any of the categories of duty, cost of transportation, or other necessary expenses. And the brief reference to such charges in the stipulation affords little or no clarification of the matter and leaves much to be desired by way of proof before the court can determine whether an allowance should or should not be made therefor.

Insofar as general expenses are concerned, it will be observed that, under the statute, not all of such expenses incurred in moving the imported merchandise from the place of shipment to the place of delivery are deductible from the United States selling price. An allowance for general expenses is limited to 8 per centum, even though the actual expenditure may exceed such amount. Under the terms of the stipulation in this case, it is clear that the actual general expenses were in excess of the 8 per centum statutory limitation. And, in this connection, it should be noted that no distinction is made under the statute between general expenses incurred by the importer and those incurred by the purchaser of the imported merchandise. In either case, all that the appraiser may deduct from the selling price is 8 per centum of the general expenses. That is precisely what the appraiser did in the appraisement of the involved merchandise, and I find no error in the appraisement on this account. In my opinion, the evidence falls short of rebutting the presumption of correctness attaching to the appraisement of the involved merchandise. Consequently, the appraised values of the merchandise must be sustained.

I find as facts:

1. That the involved merchandise consists of M.54 actions (the firing mechanism of a rifle), exported from Denmark on July 21, 1956, and imported at Baltimore, Md., on August 6, 1956.

2. That the involved merchandise was appraised on the basis of the United States value of such merchandise.

3. That, at the time of exportation of the involved merchandise, such or similar merchandise was not freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade for home consumption in Denmark nor there freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States.

4. That merchandise, such as that involved herein, was freely sold and offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade at Mattoon, Ill., which place was the principal market in the United States for the sale of such merchandise at the time of the exportation of the involved merchandise.

5. That merchandise similar to that involved herein was not freely sold or offered for sale to all purchasers in the United States in the usual wholesale quantities and in the ordinary course of trade.

I conclude as matters of law:

1. That there is no foreign or export value for such or similar merchandise or United States value for similar merchandise.

2. That there is a United States value for such merchandise.

3. That the United States value of each of the imported items is the appraised value.

Judgment will be entered accordingly.